E-FILED
Tuesday, 17 August, 2010  03:38:22 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DANIEL P. HINTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-CV-3142 |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Daniel Hinton appeals from a final decision of the Social Security Administration (SSA) denying his application for supplemental security income (SSI) under sections 1602 and 1614(a)(3)(A) of the Social Security Act. See 42 U.S.C. §§ 1381 & 1382c(a)(3)(A). Hinton brings this appeal pursuant to 42 U.S.C. § 405(g). The parties have consented to a determination of this case by a United States Magistrate Judge, pursuant to 28 U.S.C. § 636. Order, December 23, 2009 (d/e 12). The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D). Brief in Support of Complaint (d/e 11) (Plaintiff's Brief); Motion for Summary Judgment by Defendant Commissioner of Social Security (d/e 13). For the reasons set forth below, Hinton's request for summary

judgment is denied, and the SSA's Motion for Summary Judgment is allowed.

## STATEMENT OF FACTS

A.    Medical History

Hinton was born July 30, 1976.  Answer (d/e 10), Attachments 3 - 10, Administrative Record (A.R.) at 23.[1]  He graduated from high school and began college in August 1995.  He attended classes for three years until he was hospitalized for pneumonia and withdrew from classes.  After taking several years off, Hinton began taking classes again in August 2002.  He generally takes two classes per semester.

Hinton has received medical treatment from the Western Illinois University Beu Health Clinic (Beu) intermittently since December 2002. Richard Iverson, M.D., Hinton's primary care physician, characterizes Hinton's main problems as depression, anxiety, and asthma with occasional visits for allergic rhinitis.  A.R. at 227.  On September 23, 2004, Dr. Iverson's treatment notes indicate that Hinton had been experiencing a little more depression recently but that the depression was "very, very short lasting" and not severe.  A.R. at 323.  Hinton reported that he had

---

[1]The Court will cite to the Administrative Record by the consecutive Bates stamp numbers which appear on the lower right hand corner of each page.

experienced increased stress in his personal life and in getting back to

school.  Hinton returned to Beu in October 2004, complaining of allergy

problems including intermittent headaches. A.R. at 324, 327.  On

November 3, 2004, Hinton saw Dr. Iverson for "sort of a flare of his anxiety

problems."  A.R. at 329.  Dr. Iverson increased the dosage of Buspar.  At a

follow-up appointment on November 30, 2004, Hinton reported a little bit of

improvement, noting that he was feeling more motivated since the Buspar

increase.  A.R. at 330.  On December 16, 2004, Hinton returned to see Dr.

Iverson, reporting that he felt "really stressed out" due to some

appointments, but was generally not doing too badly.  A.R. at 331.

By January 21, 2005, Hinton reported that he was doing pretty well

and was quite pleased.  A.R. at 332.  Dr. Iverson noted that Hinton's

depression with anxious features was in pretty good remission and that his

asthma was pretty well controlled.  Id.  On February 28, 2005, Hinton

reported a little more anxiety than usual and that he was unsure of its

cause.  A.R. at 333.  Dr. Iverson noted that Hinton's asthma was in fairly

good control and his anxiety disorder was reasonably well controlled with

medications, although Hinton was experiencing insomnia.  Id.

In May 2005, Dr. Iverson noted as follows: Hinton "always has kind of a sad look about him but he actually looks pretty good compared to many times . . . in the past."  A.R. at 336.  Dr. Iverson directed follow up in the fall and encouraged Hinton to seek counseling.  On August 1, 2005, Hinton reported that he was not sleeping as well since running out of Trazodone, but that his depression was "ok."  A.R. at 337.  On September 2, 2005, Dr. Iverson noted that Hinton was "really doing pretty well" and was very positive about school, although he was having a little more trouble breathing.  A.R. at 338.  On September 12, 2005, Dr. Iverson noted that Hinton had increased asthma symptoms.  A.R. at 339.

On November 15, 2005, Hinton had a follow up appointment with a Dr. Karkare at Beu.  A.R. at 341.  Hinton reported that he was doing well but found it hard to wake up in the morning.  Dr. Karkare determined that Hinton was taking two Trazodone pills daily, before bedtime.  According to Hinton, he had tried decreasing this amount but was not able to sleep well.  Dr. Karkare recommended that Hinton decrease his Trazodone to 1.5 pills daily.  Hinton also reported recent asthmatic symptoms.  Dr. Karkare characterized Hinton's anxiety, depression, and asthma as "stable."  Id.

Hinton returned to Beu on November 30, 2005 and saw Dr. Baker for asthma and sinus problems. A.R. at 342. Dr. Baker noted that he had known Hinton for most of Hinton's life and characterized him as "very mellow at this time." Id. Notes from a follow up appointment on December 21, 2005 indicate that Hinton was doing fairly well overall and his asthma, depression, and anxiety were stable. A.R. at 342.

Hinton received treatment at Beu for an asthma flare on January 30, 2006. A.R. at 343. Hinton was referred by Beu to the McDonough District Hospital that same day for further evaluation. A.R. at 230-31. Notes from the visit indicate that Hinton was alert and cooperative. A nebulizer treatment was given, after which Hinton seemed to be improved.

On February 10, 2006, Hinton returned to see Dr. Iverson, who noted that Hinton was better following his trip to the emergency room. A.R. at 344. At an appointment on March 29, 2006, Dr. Iverson noted that Hinton's lungs were as clear as he had ever seen them. A.R. at 345. However, Dr. Iverson noted that Hinton had "a lot on his plate," including worries about friends moving away, his mother's health, and the fact that he needed to declare a major by the end of the semester. Id. Hinton reported

that he was going to begin counseling, and Dr. Iverson encouraged him to follow through with it.

In March and April 2006, Hinton attended counseling sessions with Ada Macias, M.A., of the Western Illinois University Counseling Center, which focused on addressing the ways in which Hinton's anxiety and depression were affecting his academics.  A.R. at 233.  Hinton failed to appear for two additional scheduled sessions.  Macias recommended that Hinton be referred for a psychiatric evaluation, but Hinton declined due to financial concerns.

In a letter to the Illinois Department of Human Services, dated July 7, 2006, Dr. Iverson opined as follows:

> [Hinton] has been able to continue going to school although making slower progress than the average student.  He has continued to be gainfully employed at times however it would be my opinion that he would have an extremely difficult if not impossible time holding full time employment.  For example he has worked for our food service and working a normal shift has proved to be too stressful for him most of the time because of his anxiety level.

A.R. at 227.

In July 2006, Hinton returned to Beu, complaining of dizziness, with pressure in his neck and at the base of his skull, which made it difficult to sleep.  A.R. at 347.  Hinton reported that he almost felt as if he would pass

out during these spells.  In August 2006, Hinton saw Dr. Iverson, who

noted possible vertigo.  A.R. at 351.

Also in August 2006, Hinton was evaluated by licensed clinical

psychologist Alan W. Jacobs, Ph.D.  A.R. at 235-37.  Hinton reported that

he had never slept well, even with medication.  Hinton further reported that

he did all of his own chores, played video games, and talked with friends.

Hinton informed Dr. Jacobs that he had agoraphobia, but after probing the

issue, Dr. Jacobs characterized Hinton's problem as "more an issue of

motivation than one of panic."  A.R. at 236.  Dr. Jacobs described Hinton

as polite and cooperative to questioning, but rather tentative in his

responses.  Dr. Jacobs noted that Hinton made only occasional eye

contact, spoke in a very soft voice, and flushed facially several times during

the interview.  In Dr. Jacobs' assessment, Hinton appeared to have chronic

problems with personal inadequacy and borderline tendencies, was

depressed, and had obsessive tendencies.

On September 9, 2006, Leslie Fyans, Ph.D. conducted a psychiatric

review of Hinton's medical records.  A.R. at 246-59.  Dr. Fyans opined that

Hinton failed to meet Listing No. 12.04 or 12.06.  According to Dr. Fyans,

Hinton displayed no limitation in activities of daily living or his ability to

maintain concentration, persistence, and pace.  Dr. Fyans noted no episodes of decompensation of extended duration.  However, Dr. Fyans concluded that  Hinton displayed mild limitation in maintaining social functioning.  Also in September 2006, Hinton was examined by Donald Habecker, M.D.  A.R. at 242-45.  Dr. Habecker described Hinton as a neatly dressed, soft spoken male who related normally to staff and surroundings.  Dr. Habecker conducted a physical examination and noted no physical limitations in Hinton's functional capacity.

In October 2006, Ernst Bone, M.D. completed a residual functional capacity evaluation of Hinton.  A.R. at 260-67.  Dr. Bone concluded that Hinton could lift fifty pounds occasionally and twenty-five pounds frequently, could stand and/or walk approximately six hours in an eight-hour workday, and could sit approximately six hours in an eight-hour workday.  According to Dr. Bone, Hinton should avoid concentrated exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation.  Dr. Bone noted that Hinton's asthma was showing good control and there were no symptoms of any additional physical impairments.  A.R. at 267.

In November 2006, Hinton was seen by Dr. Iverson.  A.R. at 354.
Hinton reported that his request for SSI had been denied and asked if
there was any more information that Dr. Iverson could forward to the SSA.
Dr. Iverson reviewed his letter, dated July 7, 2006, but noted that he had
nothing to add to it.  Id.  Hinton reported that he was doing about the same
and experiencing some dizziness.  Dr. Iverson characterized Hinton's
asthma, depression, insomnia, and acid peptic symptoms as stable.

In February 2007, Sandra Bilinsky, M.D. and Phyllis Brister, Ph.D.
reviewed Hinton's medical records and affirmed the opinions of Dr. Fyans
and Dr. Bone.  A.R. at 268-70.  Hinton saw Dr. Iverson in February 2007,
complaining of increased asthma symptoms.  A.R. at 360.  In April 2007,
Hinton returned to see Dr. Iverson for follow up on depression/anxiety.
A.R. at 362.  Hinton reported dropping a class and, as a result, losing his
campus job.  Hinton told Dr. Iverson that he had an interview at a grocery
store later in the week.  Dr. Iverson noted that Hinton "always looks sad,
but he looks better than usual and does not appear to be acutely
distressed."  Id.

On July 23, 2007, Hinton presented to Beu for a refill on his
prescriptions.  A.R. at 357.  He saw Dr. Baker.  Hinton reported late

night/early morning acute anxiety attacks for which Dr. Baker prescribed Xanax.  Dr. Baker indicated that Hinton had a history of agoraphobia and at one time felt he needed to get away from his apartment based on a sense of being closed in there.  With respect to Hinton's reported dizzy spells, Dr. Baker brought up the possibility of Meniere's disease and suggested a low dose of Valium.

Also in July 2007, Hinton underwent psychological assessment, mental status examination, risk assessment, alcohol and drug assessment, strengths and limitations assessment, and diagnostic review conducted by Licensed Clinical Professional Counselor John Reinert at North Central Behavioral Health Systems, Inc.  A.R. at 272-97. Hinton reported symptoms of depression and anxiety.  Hinton also reported that he had attempted suicide by overdose two times, once in 1991 and once in 2005.  A.R. at 285.  Hinton stated that he was hospitalized following the 1991 attempt, but did not seek any treatment, even the emergency room, following the 2005 overdose.  Reinert opined that Hinton continued to present symptoms of major depression and anxiety, which appeared to be

significant and compromise his life.  A.R. at 280.  Reinert assigned Hinton a GAF score of 48.[2]  A.R. at 297.

Hinton had an appointment at North Central Behavioral Health Systems on July 27, 2007 to develop a treatment plan and goals.  A.R. at 298.  Progress notes reveal the Hinton reported recent increases in his panic attacks and agoraphobic tendencies.  Hinton reported that he had a panic attack on the bus on the way to the appointment.  Notes indicate that Hinton appeared shaken when he arrived.

Hinton failed to appear for two appointments in August 2007 with North Central Behavioral Health Systems.  In August 2007, Hinton underwent an MRI of the brain, which revealed no abnormality to account for his symptoms of vertigo.  A.R. at 358.  On September 21, 2007, Hinton had an appointment with Sheryl Yoder of North Central Behavioral Health Systems.  A.R. at 299.  Hinton reported that he had experienced asthma and upper respiratory problems at the beginning of the new semester, which caused him to miss classes.  Hinton felt that he may need to drop

---

[2]GAF is an assessment of an individual's overall level of psychological, social and occupational functioning which is used to make treatment decisions.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32 (4th ed. 2000).  Scores range from 0 to 100, with lower numbers indicating more severe mental limitations.  Id. at 34.

one class because he was behind.  Yoder encouraged Hinton to visit campus disability services.

On October 15, 2007, Hinton saw Dr. Scott Wright, at the recommendation of Dr. Iverson, for a psychiatric evaluation.  A.R. at 300. Hinton reported that his mood was poor and he had more bad days than good ones.  He reported sleeping nine to ten hours a day and having a chronic problem with memory and focus.  Dr. Wright assigned Hinton a GAF of greater than 50.  A.R. at 301.

Hinton was a "no show" for therapy sessions with Sheryl Yoder on October 25 and December 4, 2007.  A.R. at 302.  Hinton saw Dr. Wright on December 12, 2007 for a medicine check.  Id.  Dr. Wright noted a diagnosis of major depressive disorder, recurrent, moderate; generalized anxiety disorder with panic and agoraphobic features; ADHD; and schizoid personality.  Dr. Wright characterized Hinton's mood as down; his memory, concentration, and energy as low; and his sleep as up and down. Dr. Wright adjusted Hinton's medications and ordered follow up in eight to ten weeks.  Hinton attended a therapy session with Sheryl Yoder on December 14, 2007.  A.R. at 303.  Hinton reported that he believed his mood had improved, although it was not as good as he would like it to be.

He was more relaxed now that finals were over, although he was afraid he may have received a D in one of his classes, which would affect his financial aid.  Yoder characterized Hinton as more relaxed than in the past, but noted that a recent fight with an old friend had been stressful for Hinton.

Sheryl Yoder completed a diagnostic review and treatment plan for Hinton in January 2008.  A.R. at 305-08.  She noted that Hinton's attendance at counseling had been poor and he did not make it in for the diagnostic review.  She assigned Hinton a GAF of 48.  Hinton saw Dr. Wright in February 2008.  A.R. at 304.  Hinton reported that his dizziness was worsening.  Dr. Wright characterized Hinton's mood as anxious, his concentration as fair, his motivation as low, his sleep a problematic, and his energy as low.  Dr. Wright encouraged Hinton to try one Xanax at bedtime and ordered follow up in eight to ten weeks.  In April 2008, Hinton was discharged from therapy at North Central Behavioral Health Systems due to poor attendance.  A.R. at 405-10.  However, his case was reopened in June 2008.  A.R. at 411-27.  On June 10, 2008, Licensed Clinical Professional Counselor Pam Helms noted a belief that Hinton was more concerned with receiving medication than coming to therapy.  A.R. at 415.  She stressed the need for Hinton to attend his

therapy sessions, and he stated that he understood.  Helms completed a

mental status examination of Hinton, which, other than poor recent memory

and a tendency to oversleep, was normal.  A.R. at 418-20.  Hinton reported

that he had attempted suicide in 1991, but that, at the present, he did not

want to harm himself or anyone else.  A.R. at 421-22.

B.  Administrative Proceedings

Hinton filed his application for SSI on June 22, 2006.[3]  A.R. at 109-

12. His claim was denied initially and on reconsideration.  Hinton requested

an administrative hearing, which was held June 24, 2008.  A.R. at 20-63.

Hinton appeared with counsel.  At the hearing, the Administrative Law

Judge (ALJ) heard testimony from Hinton and vocational expert Dr. John

McGowen as set forth below.

Hinton testified that he lived alone in a subsidized apartment in

Macomb, Illinois.  Hinton's father drove him to the hearing.  Hinton testified

that he did not have a driver's license and had not taken the driver's test

because he did not "like the idea of having control over somebody else's

---

[3]Hinton also applied for disability income benefits (DIB).  The SAA determined that he was uninsured for DIB purposes, and Hinton did not request reconsideration of this decision.  A.R. at 72.  Therefore, Hinton failed to exhaust his administrative remedies with respect to DIB, and he is barred from raising the issue of DIB before this court.

life." A.R. at 24. Hinton explained that he normally rode the bus to get around, but would bike short distances. Hinton testified that he was a junior at Western Illinois University. He had taken two classes in the spring 2008 semester and had failed both of them. He was not taking summer courses.

Hinton stated that he last worked as a server in a dining hall on campus. According to Hinton, the job was part-time, approximately six to nine hours per week. Hinton testified that he held this position for two years, until March 2007. Hinton explained that, in order to work for the dining hall, an individual needs to be enrolled in at least two classes. In March 2007, Hinton dropped a class and, as a result, no longer qualified for the dining hall position. Hinton stated that, prior to the dining hall job, he held an on-call catering position at the University for a year and three months. The hours of the catering job ranged from nine or ten hours a week to more than twenty hours a week.

Hinton testified that, prior to the University jobs, he held a variety of part-time positions, including catering, greenhouse work, delivering campaign leaflets, and washing dishes at a pizza restaurant. Hinton stated that he was not able to work full time because "[t]he stress level of the work

is such that it causes [him] great problems with the anxiety . . . ."  A.R. at
27.  Hinton testified that he takes Effexor, Buspar, Xanax, Remeron, and
Ritalin for anxiety and depression, as well as Albuterol, Singulair, and
Advair Diskus for asthma.  According to Hinton, the medications make him
overeat and cause problems with his sleep.  Hinton testified that he also
took prescription Pepcid for stomach pain, which seemed to help, Epidrin
for head and neck pain, and Antivert for dizzy spells.  Hinton stated that he
would experience dizzy spells about three times a week, that would last the
better part of the day.  Hinton testified that he had been taking Antivert for
approximately one year and Epidrin for about six months.  Hinton stated
that the Epidrin sometimes helped with the pain and sometimes did not.
Hinton did not know what triggered either the pain or the dizziness, and
they sometimes came together and sometimes came separately.  Hinton
considered asking his doctor for further testing to determine the cause of
the dizziness and neck pain, but did not feel he had the money for further
testing.  Hinton testified that, when he was experiencing pain and
dizziness, he had to lie down and could not even open the door if someone
knocked on it.

At the time of the hearing, Hinton's request for a medical card was pending.  Hinton explained that he received half of his medications through a patient assistance program at the campus medical center and the others were charged to his student account.  Hinton stated that, at the end of the semester, he would either ask his father to help him pay off his account or use student loan money to cover it.  Hinton had recently been approved for food stamps.  He explained that, before receiving food stamps, he lived off of a Pell Grant, student loans, and, prior to March 2007, money from his part-time employment.

Hinton testified that he would go to bed between 10:00 p.m. and 1:00 a.m. and would generally wake up in the afternoon.  Hinton stated that he read a lot, did minor yoga exercises, and would ride his bike to friends' houses to play video games and watch movies.  Other than going to friends' houses, Hinton would leave the apartment mainly to go to the grocery store or library.  Hinton stated that he tried to visit someone other than his friends at least once a week, noting that his sister lived in the same town.  Hinton spoke to his father by phone, and Hinton's mother, who lived approximately forty minutes from Hinton, would come by to see him on occasion.  Hinton testified that he did his own cooking, laundry, and

cleaning, but that housecleaning that involved dust was difficult to do due to his asthma.  When asked whether he belonged to any social groups, Hinton replied that he played role-playing games with a group of two or three friends.  Hinton explained that the game was "out of books and written down on paper" and involved rolling dice.  A.R. at 33.  When asked about other hobbies or interests, Hinton stated that he liked to look up ancient historical information on the internet.  Hinton testified that problems with dizziness prevented him from looking for work.

Hinton stated that, in high school, he was placed in a special education behavior disorder classroom halfway through his sophomore year.  Hinton was able to graduate from high school on time and started college in August 1995.  Hinton explained that he attended college for three years and then had to withdraw in 1998 after being hospitalized for pneumonia.  After dropping out of school, Hinton lived with his mother. Hinton returned to college in August 2002.

At the time of the hearing, he had been attending college for a total of nine years.  Hinton testified that he generally took two classes, or six hours, per semester.  Not counting the spring 2008 semester, Hinton stated that there were three semesters during which he dropped one class due to

psychological or physical health problems. In each of those semesters, Hinton completed the other class he was taking.

When asked what caused his attendance problems, Hinton testified that they were normally asthma-related, although he noted that there had been many mornings when it was hard to get out of bed because of depression. A.R. at 41. Hinton further testified that he experienced headaches at least three times per week, which were often accompanied by sensitivity to light. Hinton stated that he occasionally experienced nausea with the headaches and would actually vomit about once every six weeks. Hinton testified that he experienced neck pain in connection with migraine headaches, which would radiate up into his head or down into his shoulders and back. Hinton experienced occasional numbness in his arms in connection with the headaches. Hinton testified that he experienced numbness in his arms "once every couple weeks" from his shoulder to his fingers, causing him to be clumsy and drop things. A.R. at 42. Hinton further stated that he had been experiencing dizzy spells two to three times a week for about two years.

Hinton testified that he experienced panic attacks at least four times a week. During an attack, Hinton's heart races and he feels like either

curling up in a ball or leaving the room, depending on the circumstances.

The attacks are accompanied by sweating and sometimes dizziness.

According to Hinton, a panic attack would last four to six hours.  When

asked what sort of things trigger his panic attacks, Hinton responded as

follows: "Generally, the place where I live there's a lot of people around.

Riding on the bus, sitting in a classroom.  Walking down the hallways or

down the sidewalk on campus when it's in between classes when there's

lots of people around."  A.R. at 44.  Hinton explained that, when he

experiences a panic attack in class he would either leave class or sit there

and suffer through it.  Hinton further testified that, at times, he felt like he

wanted to get away from his friends when he was playing games with

them.  When this occurred, Hinton would go off into another room by

himself and try to calm down.  Hinton testified that he does his shopping at

night, when there were fewer people in the stores; however, on occasion,

Hinton experiences a panic attack in a store, which forces him to leave the

store.

Hinton testified that he exhibited symptoms of obsessive-compulsive

disorder.  Specifically, Hinton stated that he would check two to three times

to make sure that he had locked his doors, that he tended to wash his

hands "quite often," and that he liked to make sure that his movies and books were in a certain order.  A.R. at 44-45.  Hinton explained that, if the movies and books were not in order, he would "start to panic."  A.R. at 45. Hinton testified that he also exhibited symptoms of depression.  He often felt very low self-worth and every couple weeks would have a crying spell that would last for half an hour.  Hinton explained that it was often very difficult for him to even bathe, clean the house, or take the garbage out.

Hinton stated that he had trouble sleeping and used sleeping pills. He testified that, if he had something that needed to be done the next day, he could not sleep or would wake up halfway through the night.  Hinton stated that this occurred "[v]ery often.  Almost all the time."  A.R. at 45. Hinton testified that "much of the time" he slept during the day.  Id. According to Hinton, on a typical day, he would sleep from nine to thirteen hours in a twenty-four hour period.  A.R. at 45-46.  Hinton further testified that, approximately four days a week, he would stay in bed all day. Although he liked to read, Hinton testified that it was often hard for him to concentrate due to his dizziness and the tiredness resulting from the prescription Epidrin.  Additionally, once or twice a week, Hinton became so depressed that he was not able to read or concentrate.

Hinton testified that he attempted suicide in 1991 and 2005 by overdosing on pills and that he continued to have suicidal thoughts from time to time.  In those instances, Hinton stated that he wanted to be left alone and he would not answer the door or talk to anyone.  Hinton stated that he had sporadically smoked marijuana, but that he had given it up a few weeks before the hearing.

Hinton testified that, if he experienced a dizzy spell while working in his campus food service jobs, he would either lay his head down on the counter or tell someone that he had to take a break for a couple minutes and try to relax.  He stated that there were a few occasions when he did not feel like going to work and he did not get around to calling in until later.  A.R. at 49.  Hinton added "they were okay with that, but they felt that I had missed too many days to – they were about on the verge of firing me if I wouldn't have been letting go."  Id.

Vocation expert Dr. McGowen testified that Hinton had not performed work at a substantial gainful activity level since turning eighteen.  Dr. McGowen characterized Hinton's past work as "food service worker," which was light, unskilled work.  A.R. at 52.  The ALJ asked Dr. McGowen

to assume a hypothetical individual of Hinton's age, education, and work

experience with the following restrictions:

> the person could lift 50 pounds on occasion, 25 pounds
> frequently.  And could stand and/or walk about six hours, and
> could sit at least six hours in an eight-hour workday with normal
> breaks.  And assume that the person would have to avoid
> extreme – concentrated exposure to extreme heat, cold,
> wetness, and humidity, and noxious fumes, odors, dust, gases,
> et cetera.  And also . . . let's say the person should avoid
> working at unprotected dangerous heights, and around
> unprotected dangerous machinery.  And should not climb
> ladders, ropes, or scaffolds.

A.R. at 53.  Dr. McGowen testified that such an individual could return to

some of Hinton's past food service jobs.  Dr. McGowen further testified that

food service jobs existed in large numbers, up into the millions, in the

national economy.  According to Dr. McGowen, other than dishwashing

type jobs, these positions were at the light exertional level.

The ALJ then asked whether additional restrictions, namely a limit to

simple and/or repetitive work and a need to avoid jobs that require close

interaction with the public and close teamwork with coworkers, would

preclude the previously identified jobs.  Dr. McGowen testified that they

would not.  However, Dr. McGowen testified that a reduction in exertional

level to sedentary would eliminate food service jobs.  Dr. McGowen

testified that an individual who could work at the sedentary level, with no

transferable skills, a limitation to simple one and two step work, and no

concentrated exposure to dust could perform some manufacturing jobs

within the garment industry, including cuff folder, as well as electronic

assembly work.

Dr. McGowan testified that, if a fully employed individual was absent

more than two days a month from the jobs described, the individual would

lose his job.  The ALJ then asked the following question:

> If the person could show up every day, but because of medical
> reasons would either leave early, or show up late, or be away
> from the work setting the equivalent of an additional break.
> And this happened every week without fail at least once and
> randomly.  Would that have the same effect?

A.R. at 57.  Dr. McGowan replied that it would.

At the conclusion of the hearing, the ALJ informed Hinton that he was

going to send Hinton to see a psychiatrist or psychologist prior to rendering

a decision on his request for SSI.  Charles H. Farrar, Ph.D., conducted the

supplemental mental status evaluation and issued a report, dated August

13, 2008.  A.R. at 429-34.  Dr. Farrar noted that Hinton's grooming was

adequate and that Hinton was cooperative in the interview, although he

rarely made eye contact and spoke in a very soft, monotone voice.

Dr. Farrar characterized Hinton's affect as depressed.  He noted that

Hinton would "have difficulty getting along with supervisors or coworkers since he does not accept criticism well." Id. at 430. Dr. Farrar indicated that Hinton could understand one and two step operations without difficulty. Dr. Farrar noted that there was little evidence of interference with Hinton's ability to concentrate or focus. Dr. Farrar noted that Hinton's short term memory was poor, both for rote recollection and calculations. Dr. Farrar assigned Hinton a GAF score of 65.

Dr. Farrar completed a form entitled Medical Source Statement of Ability to do Work-Related Activities (Mental). A.R. at 431-34. Dr. Farrar indicated that Hinton's ability to understand, remember, and carry out instructions was not affected. Dr. Farrar indicated that Hinton had mild limitations in his ability to interact appropriately with the public and co-workers and to respond appropriately to usual work situations and changes in routine. Dr. Farrar noted that Hinton had moderate limitation in his ability to interact appropriately with supervisors. Dr. Farrar stated that Hinton appeared to have low motivation for many activities and seemed to prefer solitude or interaction with only a few friends. Dr. Farrar characterized Hinton's limitations as chronic.

On October 28, 2008, the ALJ issued an opinion denying Hinton's request for SSI.  A.R. at 9-19.  Hinton then submitted additional medical records from North Central Behavioral Health Systems, Inc. for the period from June 26 through December 8, 2008.  A.R. at 435-451.  The Appeals Council denied Hinton's request for review on April 7, 2009, after expressly considering the newly submitted records.  A.R. at 1-4.  Hinton then filed his Complaint (d/e 2) in the instant action.

C.    The ALJ's Decision dated October 28, 2008

In reaching the conclusion that Hinton was not disabled, the ALJ followed the five-step analysis set out in 20 C.F.R. § 416.920.  The analysis requires a sequential evaluation of (1) whether claimant is engaged in substantial gainful activity; (2) the severity and duration of claimant's impairment; (3) whether the impairment equals a listed impairment in 20 C.F.R. Pt. 404, Subpart P, Appendix 1; (4) whether the impairment prevents claimant from doing his past relevant work; and (5) whether claimant can perform other work, given his residual functional capacity, age, education, and work experience.  20 C.F.R. § 416.920(a)(4).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The SSA has the burden on the last step; the SSA

must show that, considering the listed factors, the claimant can perform

some type of gainful employment that exists in the national economy.

Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

The ALJ determined that Hinton met his burden on the first two steps

of the analysis.  Specifically, the ALJ found that Hinton had not engaged in

substantial gainful activity since June 20, 2004 and that Hinton's asthma,

anxiety, and depression constituted severe impairments which more than

minimally affected Hinton's ability to perform basic work functions.  A.R. at

13-14.  The ALJ characterized Hinton's other alleged impairments as non-

severe, based on the record evidence.  A.R. at 14.

At step three, the ALJ concluded that Hinton's impairments were not

severe enough to equal an impairment listed on Appendix 1.  A.R. at 14-15.

The ALJ expressly considered Listing 3.03 for asthma, but noted that the

record evidence did not support a finding that Hinton had the frequency of

attacks required to meet the listing.  The ALJ employed the special

technique for evaluating mental impairments set out in 20 C.F.R. §

416.920a.[4]  In doing so, the ALJ determined that Hinton's depression and

---

[4]When a claimant presents evidence that he suffers from a mental impairment,
SAA regulations prescribe a "special technique" the ALJ must follow. 20 C.F.R.
416.920a.  The ALJ must first evaluate the claimant's "pertinent symptoms, signs and
laboratory findings to determine whether [he has] a medically determinable mental

anxiety satisfied the diagnostic criteria of Part A of Listing No. 12.04 and

Listing No. 12.06.  However, the ALJ found that Hinton's mental

impairments did not meet the Part B or Part C criteria of these listings.[5]  In

reaching this conclusion, the ALJ determined that Hinton had mild

_____

impairment(s)."  20 C.F.R. § 416.920a(b)(1).  If so, the ALJ "must then rate the degree
of functional limitation resulting from the impairment(s)."  § 416.920a(b)(2).  This
involves consideration of such factors as the quality and level of claimant's overall
functional performance, any episodic limitations, the amount of supervision or
assistance claimant requires, and the settings in which the claimant is able to function.
20 C.F.R. § 416.920a(c)(2). The ALJ must rate the claimant's degree of functional
limitation in the following four broad functional areas: activities of daily living; social
functioning; concentration, persistence, or pace; and episodes of decompensation. 20
C.F.R. § 416.920a(c)(3). In rating activities of daily living; social functioning; and
concentration, persistence, or pace, the ALJ employs a five-point scale to rate the
degree of limitation as follows: none, mild, moderate, marked and extreme.
20 C.F.R. § 416.920a(c)(4).  In rating the degree of limitation due to episodes of
decompensation, the ALJ employs the following four-point scale: none, one or two,
three, four or more.  Id. "The last point on each scale represents a degree of limitation
that is incompatible with the ability to do any gainful activity."  Id.

After rating the degree of functional limitation, the ALJ must determine the
severity of the claimant's mental impairments using criteria set forth in 20 C.F.R. §
416.920a(d). If the mental impairment(s) is severe, the ALJ will then determine if it
meets or is equivalent in severity to a listed mental disorder by comparing the medical
findings and the ratings of the degree of functional impairment to the criteria of the
appropriate listing. 20 C.F.R. § 416.920a(d)(2). If the plaintiff's impairment is severe, but
does not meet the listings, the ALJ will assess the plaintiff's RFC. 20 C.F.R. §
416.920a(d)(3).

[5]Both Listing No. 12.04 and Listing No.12.06 contain paragraph A criteria,
paragraph B criteria, and paragraph C criteria.  The criteria in paragraph A substantiate
medically the presence of a particular mental disorder.  The criteria in paragraphs B and
C describe impairment-related functional limitations that are incompatible with the ability
to do any gainful activity. A claimant will be deemed to meet one of the listed
impairments if he can satisfy the diagnostic description in the introductory paragraph,
the criteria of paragraph A, and the criteria of either paragraph B or paragraph C.  20
C.F.R. Pt. 404, Subpt. P, App.1, § 12.00.

limitations in activities of daily living; moderate limitations of social functioning; moderate limitations of concentration, persistence, or pace; and no episodes of decompensation within one year.

The ALJ determined that Hinton retained the residual functional capacity (RFC) to lift and carry twenty-five pounds frequently and fifty pounds occasionally and to sit, stand, or walk for up to six hours each in an eight-hour workday.  A.R. at 15.  However, the ALJ found that Hinton was limited to simple, repetitive work and subject to the following restrictions: must avoid concentrated exposure to temperature extremes, wetness, and humidity; must avoid concentrated exposure to respiratory irritants; must avoid working around dangerous, unprotected heights and dangerous, unprotected machinery; can never climb ladders, ropes or scaffolds; and must avoid close interaction with the public and with co-workers.  Id.

At step four, the ALJ found that Hinton had no past relevant work.  A.R. at 17.  Thus, the ALJ correctly shifted the burden to the Commissioner to show that Hinton retained the residual functional capacity to perform work existing in significant numbers in the state and national economy.  Id.  Hinton qualifies as a younger individual under the Social Security Act and has more than a high school education.  The ALJ noted that the Medical-

Vocations Guidelines (the Grids) suggest a finding of "not disabled" for an individual such as Hinton, who could perform the full range of medium work.[6]  20 C.F.R. pt 404, subpt. P, app. 2. The ALJ recognized that Hinton had non-exertional limitations, but cited the vocational expert's testimony indicating that Hinton's non-exertional limitations did not significantly erode the medium job base.  Noting the Grids and the vocational expert testimony, the ALJ determined that jobs exited in the national economy that Hinton could perform.  Thus, the ALJ determined that Hinton was "not disabled" at step five.  Id.

## ANALYSIS

This Court will reverse the decision of the SSA if that decision is not supported by substantial evidence or results from an error of law.  Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).  This Court reviews the ALJ's factual findings to determine whether they are supported by substantial evidence.  Substantial evidence is, "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept

---

[6]The regulations define medium work as work which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 416.967(c).

the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The issue before this Court is whether the ALJ's findings were supported by substantial evidence and not whether Hinton is disabled. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003). The ALJ must at least minimally articulate his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence. Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995). This Court must not reweigh the evidence and should affirm as long as the ALJ "identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." Giles ex rel. Giles v. Astrue, 483 F.3d 483, 486 (7th Cir. 2007). If, however, "the ALJ's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." Id. (internal quotations and citation omitted).

Hinton seeks reversal of the SAA's decision, arguing that (1) the ALJ erred in determining that Hinton's depression and anxiety fail to meet Listing No. 12.04 or 12.06; (2) the ALJ erred in refusing to adopt the

opinion of treating physician Dr. Iverson that Hinton would have an extremely difficult time holding full-time employment; (3) the ALJ erroneously failed to mention the vocational expert's testimony that Hinton is unemployable; (4) the ALJ erred in determining that Hinton was not entirely credible; and (5) the ALJ has a known bias against claimants with mental impairments.  The Court addresses each of these arguments in turn.

1.  Applicability of Listing No. 12.04 and Listing No. 12.06

Listing No. 12.04 deals with affective disorders.  Listing No. 12.06 deals with anxiety related disorders.  The ALJ determined that Hinton satisfied paragraph A of Listings No. 12.04 and 12.06.  However, he concluded that Hinton failed to meet paragraph B or C under either listing.  Hinton contends that this decision was erroneous with respect to paragraph B.

In order to satisfy paragraph B under Listing No. 12.04 or Listing No. 12.06, the evidence must show that the listed impairment results in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended
duration;

20 C.F.R. Pt. 404, subpt. P, App. 1, §§ 12.04, 12.06.  Hinton contends that

he has marked difficulties in each of the first three paragraph B criteria.  As

previously noted, the job of this Court is not to reweigh the evidence, but

rather to determine whether the ALJ considered all of the important

evidence and whether his decision was supported by substantial evidence.

The ALJ determined that Hinton had mild limitations in the activities

of daily living, noting that Hinton cleaned, did laundry, and on most

occasions, adequately maintained his hygiene and grooming.  A.R. at 14.

Each of these statements is supported by the record evidence, specifically,

Hinton's testimony regarding his activities and notes from examining

sources regarding Hinton's hygiene and grooming.  See e.g., A.R. at 31-32,

243, 282, 418, 429.  The ALJ further noted that no examiner observed

significant limitations in this area.  A.R. at 14.  While Dr. Iverson opined that

Hinton would have an extremely difficult time holding full time employment,

he did not make any specific findings regarding any limitation in the areas

set out in paragraph B.  Additionally, after a records review, Dr. Fyans

determined that Hinton displayed no limitation in activities of daily living, a

determination that was affirmed on review.  A.R. at 256, 268-70.

The ALJ determined that Hinton had moderate limitation of social functioning, noting Hinton's testimony regarding problems socializing as well as comments by examiners that Hinton had problems in this area. A.R. at 14-15.  However, the ALJ declined to characterize Hinton's limitations in the area as marked.  The ALJ noted that Hinton shopped, attended classes, and worked part-time, activities that required him to interact with others, and socialized with friends.  The ALJ further recognized that Dr. Farrar indicated Hinton had only moderate limitation in social functioning.

The ALJ's determination is supported by Hinton's testimony and the medical evidence.  It is undisputed that Hinton shopped, attended classes, worked part-time until he lost his job after dropping a class, and socialized. As the ALJ correctly pointed out, Dr. Farrar's report indicates that Hinton had at most moderate limitation in his ability to interact appropriately with supervisors.  See A.R. at 432.  Additionally, Dr. Fyans determined that Hinton displayed mild limitation in maintaining social functioning, a determination that was affirmed on review.  A.R. at 256, 268-70.

The ALJ determined that Hinton had moderate limitations of concentration, persistence, or pace.  A.R. at 15.  In doing so, the ALJ noted

that Hinton shopped, read, did school work, and worked part time.  The ALJ further noted that examiners observed that Hinton was alert and oriented, had intact memory, and was able to follow directions.  The ALJ recognized that examiners at times noted that Hinton had problems with concentration, persistence, or pace; however, balancing the evidence, the ALJ characterized Hinton's limitations in the area as only moderate.  This conclusion is supported by the record evidence.  Again, Hinton undeniably participated in the activities identified by the ALJ.  Additionally, in August 2008, Dr. Farrar noted "little evidence of interference with [Hinton's] ability to concentrate or focus his attention . . . . " A.R. at 430.  In September 2006, after a records review, Dr. Fyans determined that Hinton displayed no difficulty maintaining concentration, persistence, or pace, a determination that was affirmed on review.  A.R. at 256, 268-70.

In arguing that he meets the paragraph B criteria, Hinton points to GAF scores of 48 on July 2, 2007; more than 50 on July 28, 2007; 48 on January 25, 2008; 48 on June 24, 2008; 55 on October 29, 2008; and 48 on December 8, 2008.  Plaintiff's Brief, p. 12-13.  Although Hinton does not identify it in his argument, the record reveals that Dr. Farrar assigned Hinton a GAF of 65 in August 2008.  A.R. at 430.  GAF scores of 50 or

below correspond to serious symptoms or serious impairment in social,

occupational, or school functioning.  American Psychiatric Association,

Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34.

GAF scores from 51 to 60 correspond to moderate symptoms or moderate

difficulty in social, occupation, or school functioning.  Id.  GAF scores from

61 to 70 indicate some mild symptoms or some difficulty in social,

occupation, or school functioning.  Id.

GAF scores "are intended to be used to make treatment decisions, . .

. not as a measure of the extent of an individual's disability." Jaskowiak v.

Astrue, 2009 WL 2424213, at *12 (W.D. Wis. Aug. 6, 2009).  GAF scores

do not correlate to the SSA mental impairment listings, although they can

be considered in analyzing a claimant's functional capacity.  Additionally,

the ALJ is not required to specifically address GAF scores.

Mobley-Butcher v. Astrue, 2007 WL 3124478, at *11 (S.D. Ind. Sept. 6,

2007).  In the instant case, the GAF scores from June, October, and

December 2008 were not before the ALJ at the time he rendered his

decision.  The ALJ addressed the treatment notes relating to Hinton's

depression and anxiety in detail.  Furthermore, the GAF scores of more

than 50 assigned by

Dr. Wright on July 28, 2007 and of 65 assigned by Dr. Farrar in August

2008 support the ALJ's conclusion that Hinton was not suffering from

marked limitations in paragraph B criteria.  Hinton's lower GAF scores in

July 2007 and January 2008, assigned by counselors, A.R. at 297, 306, do

not necessitate remand.  The ALJ's determination that Hinton failed to

satisfy the paragraph B criteria of Listings No. 12.04 and Listing No. 12.06

is supported by substantial evidence, and the Court can track the ALJ's

analysis on this point.

    2.  Dr. Iverson's Opinion

    According to Hinton, the ALJ erred in refusing to adopt the opinion of

treating physician Dr. Iverson set out in the letter, dated July 7, 2006, that

Hinton would have an extremely difficult time holding full-time employment.

See A.R. at 227.  The ALJ noted this opinion, but determined that it was

not entitled to controlling weight or much deference because it was

inconsistent with other substantial evidence in the record and not

supported by medically accepted clinical or laboratory diagnostic

techniques.

A.R. at 16-17.

Under Social Security Regulations, a treating source's opinion is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence . . . ." 20 C.F.R. § 416.927(d)(2).  However,  a finding of disability is reserved to the SSA, and the opinion of a medical professional on this issue is not given "any special significance . . . ."  20 C.F.R. § 416.927(e).  In the instant case, while Dr. Iverson opined that Hinton would have an extremely difficult time holding full-time employment, he failed to identify any specific functional limitations.  In fact, when Hinton told Dr. Iverson that his request for benefits had been denied, Dr. Iverson stated that he had nothing to add to his July 2007 letter.  A.R. at 354.  Other medical sources, including consultant Dr. Fyans and examining consultant Dr. Farrar, found that Hinton exhibited little or no functional limitations.  The ALJ did not err in failing to give Dr. Iverson's opinion controlling weight.

3.  Consideration of Vocational Expert Testimony

Hinton asserts that the ALJ erred in failing to mention the following testimony by vocational expert Dr. McGowen:

Q: And what is the significance of a GAF of 48 vocationally?

A: Well, I work directly from a manual rather than my experience.  A manual says anything below 50 is serious, and one of the examples that they use in unable to hold a job –

. . .

Q:  . . .  And that would be true for – would a GAF of 50 – is it 50 and below, or under 50?

A: 50 and below.

A.R. at 58.   Additionally, Hinton asserts that the ALJ erred in failing to include problems with work attendance in his residual functional capacity assessment.  These arguments are unpersuasive.

Turning first to the testimony relating to GAF scores, the Court notes that Dr. McGowen's testimony is consistent with the Diagnostic and Statistical Manual.  The GAF scale indicates that GAF scores from 41 to 50 correspond to serious symptoms "**OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (emphasis in original).  Hinton's argument that someone with a GAF of 50 or below cannot work is overstated, under the plain language of the GAF scale.  Inability to keep a job is an example of serious impairment in social, occupational, or school functioning; it does not follow that a GAF score in the 41 to 50 range

necessarily indicates an inability to keep a job.  As previously noted, GAF
scores are intended to be used to make treatment decisions, not as to
measure disability for SSA purposes.  The ALJ is not required to address
every piece of evidence and is not required to specifically address GAF
scores.  Mobley-Butcher, 2007 WL 3124478, at *11.  The ALJ's failure to
specifically address the identified testimony is not grounds for remand.

Regarding attendance, vocational expert McGowen testified that, if a
person had to be absent from work more than two days a month or
required random flexibility of work schedule one time per week, it would
preclude competitive employment in the garment manufacturing and
electronic assembly jobs.  A.R. at 57.  Hinton asserts that the ALJ's failure
to mention this testimony is grounds for reversal.  However, in determining
Hinton's residual functional capacity, the ALJ did not include restrictions
based on attendance.  A.R. at 15.  The ALJ's assessment of Hinton's
residual functional capacity is supported by substantial record evidence.
The ALJ did not err by failing to address immaterial testimony.

4.  Credibility Determination

Hinton asserts that the ALJ erred in failing to fully credit his
testimony.  According to Hinton, the ALJ's attempts to discredit him are

"illusory."  <u>Plaintiff's Brief</u>, p. 17.  As the U.S. Court of Appeals for the

Seventh Circuit noted, "[a]pplicants for disability benefits have an incentive

to exaggerate their symptoms, and an [ALJ] is free to discount the

applicant's testimony on the basis of the other evidence in the case."

<u>Johnson v. Barnhart</u>,

449 F.3d 804, 805 (7th Cir. 2006).  An ALJ is in the best position to

determine the credibility of witnesses; therefore, this Court must afford the

ALJ's credibility determinations considerable deference, overturning them

only if they are "patently wrong."  <u>Craft v. Astrue</u>, 539 F.3d 668, 678

(7th Cir. 2008).

In the instant case, the ALJ properly presented specific reasons for

his adverse credibility determination.  <u>See</u> SSR 96-7p.  The ALJ

determined that the medical record did not support mental limitations to the

extent alleged by Hinton.  A.R. at 13, 16.  Specifically, the ALJ noted that,

despite Hinton's testimony regarding neck pain, no examiner noted any

significant problems with Hinton's neck.  The record supports this

statement.  The ALJ further noted that, while Hinton stated that he

neglected his hygiene, most examiners characterized Hinton's grooming as

at least adequate.  A.R. at 13.  While there are some occasions when

examiners noted Hinton's hygiene was fair or subpar, see, e.g.  A.R. at 235, 332, most examiners characterized Hinton's grooming as adequate or better.  See, e.g., A.R. at 243, 282, 418, 429.  Thus, the ALJ's statement is again supported by the record evidence.

The ALJ specifically addressed Hinton's work history as it related to his credibility.  The ALJ noted that Hinton never earned more than $4,300 in nine years of annual recorded income for the seventeen year period from 1988 to 2005.  A.R. at 10.  Without explanation, the ALJ concluded "[t]his work history does not lend much credibility to the claimant in his allegations about his work-related limitations."  Id.  According to Hinton, his sparse employment history actually corroborates his testimony that he is unable to work full time.  However, the issue is not as clear cut as Hinton asserts.  Hinton's minimal earnings could also indicate a failure to attempt to work more than a minimal amount.  The ALJ's conclusion that Hinton's earning record undermined his credibility does not necessitate remand, given the highly deferential standard of review for credibility determinations.

Additionally, the ALJ found that Hinton's reported activities were inconsistent with the degree of limitation claimed to arise out of his asthma, noting that Hinton rode his bicycle, worked part time, and shopped.

A.R. at 16.  The record supports a finding that Hinton engaged in these activities.  The ALJ also reasonably concluded that Hinton's claimed mental limitations were inconsistent with his ability to perform simple tasks, based on statements in the medical records that Hinton had intact memory and could concentrate and interact appropriately.  See A.R. at 237, 282-83. Finally, the ALJ concluded that Hinton's claimed mental limitations were inconsistent with his demonstrated ability to interact appropriately at least superficially with others when shopping, working part time, and attending classes.  Again, the record supports a finding that Hinton engaged in these activities.  There is nothing in the record to indicate that the ALJ's failure to fully credit Hinton's testimony was patently wrong.

5.  Alleged Bias against Claimants with Mental Impairments

Hinton asserts that the ALJ has a known bias against claimants with mental impairments.  Plaintiff presents statistics compiled by his counsel's office to support this argument.  According to Hinton, in 54 cases brought by Hinton's attorney before the ALJ, 41 claimants alleged mental impairments.  Of those 41 claimants, 34 claimants, 82.9%, were deemed not disabled.  Plaintiff's Brief, p. 21-22.

A claimant who believes that an ALJ is biased against him can request review from the Appeals Council; "'[f]act finding with respect to bias claims is to be done at the administrative level and is waived if not brought up below.'" Fischer v. Astrue, 2010 WL 2663084, at *13 (C.D. Ill. July 1, 2010) (quoting Ward v. Shalala, 898 F.Supp. 261, 269 (D. Del. 1995)). Hinton concedes that he did not present this statistical evidence to the SAA, but argues that it was not available at the time his administrative proceeding was underway. Hinton fails to explain why the information was not available after the ALJ's decision was issued in October 2008 or identify the point at which it became available. Hinton has waived his bias claim. Additionally, even if the Court were to consider the claim on its merits, it would  fail. The statistics presented fail to  rebut the general presumption that the ALJ is unbiased, and there is no indication that the methodology used to compile the statistics was scientifically sound. See id.

## CONCLUSION

THEREFORE, for the reasons set forth below, Plaintiff's Brief in Support of Complaint (d/e 11), which the Court construes as a motion for summary judgment in accordance with Local Rule 8.1(D), is DENIED, and

the Motion for Summary Judgment by Defendant Commissioner of Social

Security (d/e 13) is ALLOWED.  All pending motions are denied as moot.

THIS CASE IS CLOSED.


IT IS THEREFORE SO ORDERED.

ENTER:    August 17, 2010

          FOR THE COURT:


                          _____*s/ Byron G. Cudmore*_____
                          BYRON G. CUDMORE
                          UNITED STATE MAGISTRATE JUDGE